Filed 3/21/25 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ELIJAH JACKSON,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF<br>SAN DIEGO COUNTY,<br><br>    Respondent;<br><br><br>THE PEOPLE,<br><br>    Real Party in Interest. | D084751<br><br>(San Diego County<br>Super. Ct. No. SCD300281)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>NO CHANGE IN THE<br>JUDGMENT |

THE COURT:

It is ordered that the opinion filed on February 28, 2025, be modified as follows:

On page 12, delete the paragraph beginning with "In addition," and replace with the following:

> In addition, Jackson claims that the traffic stop and search of the car he was driving were the product of implicit racial bias. If the instant writ is resolved in Jackson's favor and we remand the matter back to the trial court to reconsider Jackson's motion, Jackson could ask the superior court to, "in the interest of justice,

dismiss enhancements . . . or reduce one or more charges."
(§ 745, subd. (e)(1)(C).)  In the alternative, Jackson could make
an argument that the gun should be suppressed.  (§ 745,
subd. (e)(4) ["The remedies available under this section do not
foreclose any other remedies available under the United States
Constitution, the California Constitution, or any other law"].)  We
offer no opinion as to whether either of those arguments, if made
below, would prove successful.  Rather, we mention those
arguments as possible avenues that could ultimately lead the
superior court to dismiss the firearm offense against Jackson,
and Jackson may not have to stand trial, which constitutes an
extraordinary circumstance to warrant writ relief.

There is no change in the judgment.

The petition for rehearing is denied.

IRION, Acting P. J.

Copies to:  All parties

2

Filed 2/28/25 (unmodified version)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ELIJAH JACKSON, | D084751 |
| Petitioner, | (San Diego County Super. Ct. No. SCD300281) |
| v. | |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDING in mandate.  Petition granted.

Jo E. Super, Chief Deputy Public Defender, and Sadaf Tajzoy Hane, Deputy Public Defender for Petitioner.

Summer Stephan, District Attorney, Linh Lam, Valerie Ryan, and Sara Staninger, Deputy District Attorneys, on behalf of Real Party in Interest.

No appearance for Respondent.

Petitioner Elijah Jackson was charged with a firearm possession offense after police discovered a handgun during a search of the car he had been driving.  Jackson filed a motion under the California Racial Justice Act

of 2020 (Racial Justice Act) (Stats. 2020, ch. 317, § 1) claiming that the police stopped and searched his car because he is Black.  The superior court denied Jackson's motion for failure to state a prima facie violation under the Racial Justice Act.  Because we conclude Jackson produced facts, if true, that establish there is a substantial likelihood that a violation of the Racial Justice Act occurred (see Pen. Code,[1] § 745, subd. (h)(2)), we issue a writ of mandate and direct the trial court to grant an evidentiary hearing to consider Jackson's motion.

FACTUAL AND PROCEDURAL BACKGROUND

The People charged Jackson, who is Black, with carrying a loaded firearm in violation of section 25850, subdivision (a) after police discovered a handgun during a search of the car he had been driving.  In addition, it was alleged that Jackson was not the registered owner of the firearm (§ 25850, subd. (c)(6)).

The testimony at the preliminary hearing established that a group of four San Diego Police Department (SDPD) patrol officers were conducting an operation to "saturate" the Skyline Hills neighborhood to "suppress any violent crime going on and show [their] presence in the area."  In doing so, the officers drove around the area, looking for people they recognized as having warrants.  Additionally, the officers were patrolling simply to show their presence and deter any potential crime.  Officer Cameron Watson explained that the unit was focused on Skyline as "a particularly violent neighborhood."  Watson admitted on cross-examination that "saturation patrols" are far more common in areas like Skyline than areas like Kensington, Scripps Ranch, and La Jolla.

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

2

During patrol on the day in question, Watson observed a car, driven by Jackson, with illegally tinted windows. He watched Jackson park the car in a strip mall and go inside a smoke shop. Jackson was wearing a black jacket, a black hat, and a black ski mask. Although the mask had an opening for the eyes, nose, and mouth, Watson commented that the mask "could easily conceal [Jackson's] identity."[2] Watson referred to the mask as a "Pooh Shiesty" mask because it was a style worn by a famous rapper with that name.

While heading into the smoke shop, Jackson was accompanied by his younger brother, who also is Black and was wearing red pants. Watson noted that the color red was often worn by gang members in the area. Watson confirmed that neither Jackson nor his brother did anything that made him suspect they were a threat before and while they were in the smoke shop.

Watson did not contact Jackson in the parking lot. Rather, he waited until Jackson and his brother drove away, followed the car for a few minutes, and then conducted a traffic stop. When Watson contacted Jackson, Jackson appeared nervous and seemed to be "trying to rush the traffic stop." In addition to Watson, three other officers participated in the traffic stop. One of the officers observed that there was a baseball bat on the floor between the driver's seat and the door. According to Watson, when Jackson was asked about the baseball bat, he provided "multiple answers," including that the bat was for baseball, the car belonged to his mother (implying the bat was hers), and the bat was used for protection. Based on concerns about the baseball

2       There is no indication in the record that Jackson was wearing the ski mask in a manner to conceal his identity.

3

bat, the ski masks, the brother's red pants,[3] and the fact that Jackson admitted he lived in an apartment complex with a history of violence,[4] Watson asked the brothers to get out of the car to allow for a pat-down search and to search for weapons inside the vehicle to ensure officer safety. During the subsequent search, officers located an unregistered loaded firearm in the center console.[5]

At the conclusion of the preliminary hearing, the trial court denied Jackson's motion to suppress after finding that Watson's search of the car was lawful. The court held Jackson on count 1. The People subsequently filed an amended felony complaint.

Jackson then filed a motion for relief under the Racial Justice Act. Jackson argued that Watson's actions and speech demonstrated racial bias against him. Jackson asserted that the stop was the result of mistaken assumptions based on the neighborhood where Jackson lived and the clothes he and his brother were wearing. Jackson submitted evidence that he and his brother had been pulled over multiple times by the same officers for the same tinted windows, but they never received a citation for the window tint.

---

[3]    Watson testified that the Skyline neighborhood is a territory claimed by the criminal street gang called Skyline Piru, which is a blood set with gang members often wearing the color red. Watson admitted that he did not know for sure if Jackson or his brother were active members of Skyline Piru, but he "knew there was a possibility due to the red coloring of the pants that [Jackson's brother] was wearing."

[4]    Watson testified that Jackson and his brother were returning to Meadowbrook Apartments, which he knew to be "a violent complex to live in," and Watson had "personally arrested or been involved in the arrest of at least six people in or around that complex that were in possession of firearms."

[5]    While interacting with Jackson during the traffic stop, Watson referred to Jackson as "boss," "man," and "bro." That said, at times, Jackson referred to Watson as "bro."

4

Further, Jackson's mother stated that the same officers had pulled over her sons multiple times and harassed them.

Jackson supported his petition with statistical evidence demonstrating that SDPD officers disproportionately conduct traffic stops and searches on Black and Latino residents and focus their "saturation patrols" on minority neighborhoods. The statistics also showed that 26 percent of all use of force incidents by the SDPD between 2016 and 2020 were against Black people, who make up 6.2 percent of the population in San Diego. Thus, Black people in San Diego were subject to force by the SDPD 4.6 times as often as white people. Data also showed that, once stopped by the police, Black people were searched 2.6 times as often as their white counterparts. Regarding traffic stops of Black people, 37 percent of stops by the SDPD were for equipment stops and 12 percent were for license/registration stops compared to 20 percent and 7.7 percent of the stops respectively for white people. And 72 percent of the SDPD stops of white drivers was for moving violations, but only 51 percent of stops of Black drivers was for that same reason. Once stopped, Black people were arrested 1.7 times as often as white people, and they were also 1.5 times as likely to be released with a warning or no action taken. Additionally, statistics were offered showing that although Black people make up only 6.2 percent of the population of San Diego, they comprised 23 percent of all people stopped between 2018 and 2020. Finally, data showed that 74 percent of the officers who made stops of Black people did so at rates that were higher than the proportion of Black people in the areas that they patrol.

Jackson also presented evidence of a recent traffic stop by some of the same officers involved in his traffic stop that followed a similar pattern of stopping a suspected gang member's car for tinted windows as an alleged

5

pretext to question the driver and search for illegal items. Additionally, Jackson offered media interviews and newspaper articles to show that San Diego law enforcement was aware of the various studies showing discrimination and racism but ignored such studies.

The People opposed Jackson's motion, contending that Jackson did not provide evidence indicating that any of the officers exhibited bias or animus toward Jackson or his brother based on their race, ethnicity, or national origin. The People also cautioned the court to avoid imputing implicit bias onto the officers based on the statistics, data, and articles Jackson submitted in support of his motion.

The court held an initial hearing on the motion to determine whether Jackson established a prima facie showing of a Racial Justice Act violation to warrant an evidentiary hearing. At the prima facie hearing, Jackson's counsel argued that Jackson had met his burden and focused the court on the gang saturation units, the SDPD's concentration on certain areas in San Diego, and the ongoing harassment by the officers of Jackson and his brother. Defense counsel also emphasized that the officers allowed Jackson to go into the glove compartment during the traffic stop and argued that none of the officers were "scared of him." Further, Jackson's counsel pointed the court to the statistics that he had submitted regarding the difference in traffic stops for minorities compared to white individuals.

In response, the People argued the court should give the statistics provided by Jackson "very little weight in assessing whether [Watson] on this occasion exhibited bias against [Jackson]." The People further asserted that the court should simply focus on Watson's actions and not use any of the statistical information to explain Watson's determination to pull over Jackson and then search the car. The People reiterated that Watson and his

6

fellow officers conducted a legally valid stop and were justified in searching the car.

The trial court asked the People about the need to consider implicit bias, specially referencing *Bonds v. Superior Court* (2024) 99 Cal.App.5th 821 (*Bonds*). The People replied that "it simply doesn't have enough weight, in light of the actual facts of this case, to raise more than a mere possibility that there was bias at issue here."

The court then asked the People if it could weigh the evidence at the prima facie stage, and the People correctly acknowledged that the court could not do so.

After the court and the People discussed the facts in *Bonds*, the court noted that it did not see "any statement or anything that the officer said or did that indicated explicit bias" in the instant matter. The court then asked:

> "So the question I have to keep coming back to based upon the direction from the Fourth DCA Justice Dato, who wrote the opinion, is how can this court—how can the trial court determine whether there was implicit bias on the part of the officer when the officer was making this stop?"

The People answered the court's inquiry by emphasizing that implicit bias "is a very difficult question to assess." The People then acknowledged that they were not sure how it could be proved and cautioned the court not to impute bias on Watson based on what other officers might have done on other occasions. The People further asserted:

> "So it is very difficult to discern that implicit bias, but that—that doesn't necessarily render that evidence as proof. If it doesn't have the proper weight or proper showing for it, then the Court, I think, doesn't have to, again, make this logical jump of imputing it to this particular officer on this occasion."

7

Jackson's counsel then argued that it was clear that the SDPD officers treat different areas of San Diego differently. She urged the court to review Watson's actions, noting that he watched Jackson and his brother enter the smoke shop and emphasized that Watson had previous contact with Jackson and his brother. Moreover, defense counsel acknowledged that both men had masks on their faces, but Watson later acknowledged that the masks were like one worn by a famous rapper. The court found the wearing of the masks "weird" especially because it was summer.

Jackson's counsel posited that Jackson and his brother were wearing the masks because they were fans of the rapper. She then summarized her argument as follows:

> "Not one patrol vehicle pulls over someone for tinted windows, but two do. Not one officer goes up to the side and says, 'You need get your windows fixed. They're tinted. Give me your license and registration.' Four do.
>
> "Why would the passenger need to be talked to who they've already seen, who they know is there—they know there's no one else in the car—for a tinted window? Why would they not write the ticket? Why do they start asking questions about the rapper, drugs, guns, instead of just walking through with the ticket?
>
> "And I think that the totality of the circumstances plus the fact of the area that they're in their headquarters SDPD tells them is a high gang area, and that this particular group of people is a gang saturation team in this area all builds together this implicit, unconscious bias they may not be aware of, that these two young black men who are checking all the boxes of concern might be lying about what's in their vehicle, which leads them, I think, to insist on a search over a bat, when there's no other reason to search the vehicle at that point. Nothing that they have done would say 'We're worried about you. You should search the vehicle.' It's who they are.

"And, again, I think that for purposes of the prima facie, that addresses this Court's concern on 'How can I sit here and wonder what was in the mind of his officer?' "

The court was not persuaded and denied Jackson's motion, explaining:

"In this case, as I—we discussed with the attorneys, the Court—the facts are really not in dispute. The officers made some observations. They observed the defendant driving in a vehicle that had tinted windows. They observed the defendant go into a smoke shop, wearing some sort of a mask, come out of the smoke shop. The officers then stopped the vehicle some distance away for the violation of the tinted windows. While the officers were at the car, the officers observed the bat and then thereafter conducted a search.

"At this point, the Court does not find that the defendant has met the prima facie standard, that the—basically, the defendant is concluding or making—concluding that based upon this, that the officer's actions were racially motivated. Therefore, the motion at this point is denied."

Jackson then filed a petition for writ of mandate in this court. In response, we requested an informal response from the People. The People filed an informal response, and we issued an order to show cause why relief should not be granted. The People opted to file a return, and Jackson filed a traverse.

## DISCUSSION

The Racial Justice Act, which is codified in three interrelated statutes (§§ 745, 1473, subd. (f), 1473.7, subd. (a)(3)), provides that "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin" (§ 745, subd. (a)). The Racial Justice Act was passed with the express intent "to eliminate racial bias from California's criminal justice system" and "to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing." (Assem.

9

Bill No. 2542 (2019–2020 Reg. Sess.) § 2, subd. (i) (Assem. Bill 2542).) The Legislature's goal was "to provide remedies that will eliminate racially discriminatory practices in the criminal justice system, in addition to intentional discrimination." (Assem. Bill 2542, § 2, subd. (j).) The Legislature recognized that "[i]mplicit bias, although often unintentional and unconscious, may inject racism and unfairness into proceedings similar to intentional bias" and specified that its intent was "not to punish this type of bias, but rather to remedy the harm to the defendant's case and to the integrity of the judicial system." (*Id.*, subd. (i).)

The Racial Justice Act specifies four categories of conduct, any one of which, if proven by a preponderance of the evidence, establishes a violation. (§ 745, subd. (a)(1)–(4).) The first of those categories is relevant here. Specifically, a violation exists when "(1) [t]he judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin." (*Id.*, subd. (a)(1).)

When a defendant files a motion in the trial court alleging a violation of the Racial Justice Act, the first step is for the trial court to determine whether the defendant has made "a prima facie showing of a violation." (§ 745, subd. (c).) The statute specifically defines " '[p]rima facie showing' " to mean "that the defendant produces facts that, if true, establish that there is a substantial likelihood that a violation of subdivision (a) occurred." (*Id.*, subd. (h)(2).) The statute further states that "a 'substantial likelihood' requires more than a mere possibility, but less than a standard of more likely than not." (*Ibid.*) Moreover, "a defendant seeking relief under the Racial Justice Act must state fully and with particularity the facts on which relief is sought, and include copies of reasonably available documentary evidence

10

supporting the claim. The court should accept the truth of the defendant's allegations, including expert evidence and statistics, unless the allegations are conclusory, unsupported by the evidence presented in support of the claim, or demonstrably contradicted by the court's own records. . . . [T]he court should not make credibility determinations at the prima facie stage." (*Finley v. Superior Court* (2023) 95 Cal.App.5th 12, 23 (*Finley*), citation & fn. omitted.)

Once a defendant makes a prima facie showing, the trial court proceeds to determine whether the defendant has met "the burden of proving a violation of subdivision (a) by a preponderance of the evidence." (§ 745, subd. (c)(2).) The applicable remedies are set forth in subdivision (e) of section 745.

In an appeal from a trial court ruling that a defendant failed to make a prima facie showing of a Racial Justice Act violation, we apply a de novo standard of review. (Cf. *People v. Flores* (2023) 96 Cal.App.5th 1164, 1170 [de novo review of whether a prima facie case has been made in a petition for resentencing under § 1172.6].)

As a threshold matter, the People argue that writ relief is not warranted here because no extraordinary circumstances exist. Specifically, they claim the instant writ does not present any significant legal issues, and Jackson has an adequate appellate remedy. We are not persuaded.

The Racial Justice Act is a fairly new piece of legislation and cases interpreting it typically require courts to grapple with novel issues of law as they consider how best to implement the act. As this court pointed out, "[a]ppellate decisions interpreting it are, as yet, few." (*Bonds*, *supra*, 99 Cal.App.5th at p. 828.) Thus, it is not surprising that several appellate courts, including this one, have found writ review appropriate in addressing

issues raised under the Racial Justice Act.  (See, e.g., *Young v. Superior Court* (2022) 79 Cal.App.5th 138, 169–170 [writ of mandate issued directing the superior court to vacate its discovery order that denied petitioner's discovery motion brought under the Racial Justice Act]; *Finley*, *supra*, 95 Cal.App.5th at pp. 16, 25–26 [writ of mandate issued vacating the superior court's denial of a motion pursuant to the Racial Justice Act because the lower court had incorrectly conflated the varying burdens of proof outlined in the act]; *Bonds* at pp. 830–831 [writ of mandate issued directing the trial court vacate its denial of petitioner's Racial Justice Act motion after determining that the trial court applied the wrong legal standard in considering that motion]; *Mosby v. Superior Court* (2024) 99 Cal.App.5th 106, 133 [writ of mandate issued vacating the lower court's denial of petitioner's request for a hearing, after determining petitioner had indeed met his burden and could proceed to an evidentiary hearing].)  Because of the act's newness and the lack of sufficient authority addressing a petitioner's burden at the prima facie stage to establish the likelihood of implicit bias, we believe the instant matter involves both a significant and novel legal issue.

In addition, Jackson claims that the traffic stop and search of the car he was driving were the product of implicit racial bias.  Thus, his motion under the Racial Justice Act could result in the gun being suppressed.  In this sense, if the instant writ is resolved in Jackson's favor and we remand the matter back to the trial court to reconsider Jackson's motion, a chance exists that the trial court will grant Jackson's motion, the gun will be suppressed, and the possession of a firearm offense would be dismissed.  Accordingly, Jackson would not have to stand trial.

We acknowledge, as the People contend, that if we do not act on the instant writ, Jackson still has the right to appeal this issue if he is convicted.

However, it would be a waste of resources to allow the trial to proceed if it should have never occurred in the first place, especially when the issue to be determined is fully briefed before us. We therefore shall exercise our discretion and address the instant writ on the merits.

Here, there is no argument that Watson or the other police officers exhibited any explicit bias. Rather, the focus of our inquiry is on the possible presence of implicit bias. Specifically, did Jackson make a prima facie showing of a violation of the Racial Justice Act, which requires him to produce facts that, if true, establish that there is a substantial likelihood that Watson's actions (or that of his fellow officers) were motivated by implicit bias? As set forth *ante*, the statute defines a substantial likelihood as more than a mere possibility but less than a standard of more likely than not. (§ 745, subd. (h)(2).)

In his petition, Jackson argues the trial court erred in failing to conclude that it satisfied his burden. To this end, he claims the court failed to consider statistical evidence of racially biased policing within the SDPD and improperly found that Watson's behavior was not motivated by implicit bias.

In response, the People contend that the trial court correctly found that Jackson had not satisfied his prima facie burden. Moreover, they assert that Jackson is improperly using the facts and expert opinions in *Bonds, supra,* 99 Cal.App.5th 821 to bolster his arguments here.[6] Although we do not share the People's concern about Jackson misusing *Bonds*, we agree with the

---

[6] In *Bonds*, we issued a writ directing the trial court to conduct a new evidentiary hearing under the Racial Justice Act to consider whether the officer who initiated and conducted the traffic stop of the petitioner exhibited implicit bias based on race. (*Bonds*, *supra*, 99 Cal.App.5th at p. 824.)

People that some key differences between *Bonds* and the instant matter exist.

For example, in *Bonds*, the trial court agreed with the petitioner that he had satisfied his burden at the prima facie stage and set the matter for an evidentiary hearing. (*Bond*s, *supra*, 99 Cal.App.5th at p. 826.) Therefore, it is not surprising that the evidence the trial court considered in *Bonds* was more robust and developed than the evidence considered at the prima facie stage in the instant matter. Indeed, as the People point out, the petitioner in *Bonds* offered the testimony of three experts as well as the arresting officer's testimony and statistical evidence. (See *id*. at pp. 826–827.) We acknowledge that Jackson discussed *Bonds* at length in his petition and compares the evidence he offered below with the evidence the experts considered in *Bonds*. However, we will not consider the testimony of the experts in *Bonds* as if those same experts testified at Jackson's prima facie hearing below.

Another important difference between *Bonds* and the instant matter is that the trial court granted an evidentiary hearing in *Bonds*. As such, it weighed the petitioner's evidence. In doing so, the court concluded "that aggregate statistics about a police *department* were entitled to little weight because 'there is no way for a court to draw . . . conclusions [about an officer's state of mind] from general statistics without speculating whether a particular officer's conduct on a specific occasion falls within those statistics and any conclusions based on such statistics.' " (*Bonds, supra,* 99 Cal.App.5th at p. 827.) In the instant matter, the court could not weigh any of the evidence Jackson offered. (See *Finley, supra,* 95 Cal.App.5th at p. 23.)

In *Bonds*, the trial court ultimately denied the petitioner's motion under the Racial Justice Act. (*Bonds, supra,* 99 Cal.App.5th at p. 827.) We found fault with the trial court's approach because there was no indication in

14

the record that the court considered, as required by the Racial Justice Act, that the arresting officer could have been motivated by implicit bias. Rather, the court simply concluded that the officer "could not exhibit racial bias unless he 'knew' the race of the vehicle's occupants before initiating the stop." (*Id.* at p. 830.)

In contrast to the trial court in *Bonds*, the trial court here specifically noted the issue before it was whether Jackson carried his prima facie burden to show that the actions of Watson and/or the other officers were motivated by implicit bias: "[H]ow can the trial court determine whether there was implicit bias on the part of the officer when the officer was making this stop?" Thus, the issue before us here is at least somewhat different than what we grappled with in *Bonds*.

That said, in *Bonds*, we discussed at length the importance of providing relief to victims of implicit bias:

> "Whatever may be uncertain about the Racial Justice Act, there are a few things that are abundantly clear. Perhaps most obvious is that the Racial Justice Act was enacted to address much more than purposeful discrimination based on race. Indeed, the primary motivation for the legislation was the failure of the judicial system to afford meaningful relief to victims of unintentional but *implicit* bias. In an uncodified section of Assembly Bill No. 2542 (2019-2020 Reg. Sess.), the Legislature explained, 'Implicit bias, *although often unintentional and unconscious*, may inject racism and unfairness into proceedings similar to intentional bias. The intent of the Legislature is not to punish this type of bias, but rather to remedy the harm to the defendant's case and to the integrity of the judicial system.' (Stats. 2020, ch. 317, § 2, subd. (i) [uncodified], italics added.)" (*Bonds, supra*, 99 Cal.App.5th at p. 828.)

We further noted that "implicit bias is, by definition, *un*intentional and *un*conscious." (*Bonds, supra*, 99 Cal.App.5th at p. 829.) Thus, "implicit bias

15

can appear at multiple levels. Certainly, an officer (or other participant in the criminal justice process), observing that a defendant is Black, could 'unintentionally' treat them differently." (*Ibid*.) Moreover, we observed that "implicit bias can manifest itself in other ways based on unstated or even unconscious assumptions." (*Ibid*.)

We recognize that our discussion of implicit bias in *Bonds* did not provide a bright line test to apply to every inquiry into the possible existence of implicit bias in response to a Racial Justice Act motion. This is because the very nature of such unintentional and unconscious bias does not lend itself to a simple, one size fits all analysis. As the trial court and the People acknowledged below, ferreting out the existence of implicit bias is a herculean task that involves careful consideration of a variety of types of evidence, often including data and statistics, in search of the probability that an actor was motivated by implicit bias. And although this clearly is an arduous task, it is not impossible. However, this type of inquiry requires a case by case approach based on the unique evidence offered.

Thus, we now turn to the evidence Jackson presented. Initially, we note that the trial court commented that "the facts are really not in dispute." In addition, there is no indication in the record that any evidence provided by Jackson was excluded. Further, the People do not make any arguments that the evidence proffered by Jackson was inadmissible. We therefore will consider all the evidence Jackson submitted in response to his motion under the Racial Justice Act and assume that the trial court considered that evidence.

We begin with the statistics and data Jackson proffered. We note that the data provided by Jackson clearly shows a stark disparity in the treatment of Black people pulled over by the SDPD compared to white people. For

example, once stopped by the police, Black people were searched 2.6 times as often as their white counterparts. Regarding traffic stops of Black people, 37 percent of stops by the SDPD were for equipment stops and 12 percent were for license/registration stops compared to 20 percent and 7.7 percent of the stops respectively for white people. And 72 percent of the SDPD stops of white drivers was for moving violations, but only 51 percent of stops of Black drivers was for that same reason. Once stopped, Black people were arrested 1.7 times as often as white people, and they were also 1.5 times as likely to be released with a warning or no action taken. Additionally, statistics were offered showing that although Black people make up only 6.2 percent of the population of San Diego, the comprised 23 percent of all people stopped between 2018 and 2020.

The People acknowledge this statistical evidence but note that Jackson did not provide a "correlating declaration from the person who generated these findings, nor any other expert declaration at all." The People further argue that because of the absence of any such supporting declarations, "[t]he trial court . . . would have been well within its gatekeeping function . . . to disregard [these statistics] as conclusory or made without explanation." Yet, the People's argument appears to not be of the moment as they concede that the court "consider[ed] all of the proffered evidence" and "accept[ed] the truth of the statistics."

Moreover, the statistical evidence presented by Jackson seems to be the type contemplated under the Racial Justice Act to be helpful to the court in analyzing a claim of implicit bias. (See *Bonds*, *supra*, 99 Cal.App.5th at pp. 830–831 ["in section 745, subdivision (c)(1), the Legislature has specifically provided that 'reliable, statistical evidence, and aggregated data are admissible for the limited purpose of determining whether a violation of

17

subdivision (a) has occurred' "].)  Although we agree with the People that the statistical evidence alone would not be sufficient to show Watson's and/or his fellow officers' stop and search of Jackson was the product of racial bias (see *Bonds,* at p. 831), the data provided a lens through which the trial court should have viewed the other evidence provided by Jackson, especially at the prima facie stage.

Watson pulled over Jackson because the car he was driving had illegally tinted windows.  In other words, the stop was based on an equipment problem with the car.  The data shows that Jackson, as a Black man, was significantly more likely to be pulled over by the SDPD for an equipment problem with the car than a white driver.  Further, once pulled over, the data showed that the police were much more likely to search Jackson and the car he was driving.  Additionally, during the traffic stop, Jackson stated that he had been pulled over by "y'all"[7] "like eight times."[8]  Further, Jackson

---

[7]    It is unclear if Jackson was stating that Watson had pulled him over eight times before, some combination of the four officers on the scene had pulled him over eight times, or that simply the police had pulled him over eight times.  However, at the very least, Jackson's comments suggest that Watson had previously pulled him over.

submitted evidence that his brother had been pulled over by the police three to five times between 2022 and August 2023. His brother indicated that Jackson was with him on at least one of those prior times. And Jackson's brother stated they were pulled over because of the tint of the car's windows. During the various traffic stops, the police would ask Jackson's brother about his tattoos and whether he was affiliated with a gang. Jackson's brother also said that if he asked the police questions, they would accuse him of being aggressive.

Jackson also presented a statement by his mother. Among other things, she stated that the same officers at issue in the instant matter had pulled over her sons "about five times in 2022" while they were driving her car because of the tint of the car's windows. And it is undisputed that neither

---

8    The People note that Jackson's claim that he had been pulled over eight times is contradicted by Watson's statement that he had never met Jackson before, which is contained in the transcription of the officer's body camera. They further argue that because Jackson submitted the transcript, he submitted contradictory evidence. Relying on *Finley*, *supra*, 95 Cal.App.5th at page 22, the People then claim that the caselaw does not explain what a trial court should do with such evidence at the prima facie stage but contend the "better rule would be to have the trial court to consider *both* of the conflicting proffered facts as 'unsupported by the evidence presented in support of the claim,' or at least consider those 'facts' neutralized in the prima facie determination, since credibility determinations cannot be made at the prima facie state." We disagree with the People's suggested approach. At the prima facie stage, the court is not to engage in credibility determinations or the weighing of evidence. (*Finley*, at pp. 23–24.) But that is precisely what the People are suggesting that the trial court should have done. That method is beyond what is permitted at the prima facie stage under the Racial Justice Act. (See *id.* at p. 24 ["At the prima facie stage, the trial court should have focused on the accuracy and significance of Finley's proffered facts, rather than weighing his evidence against Officer Gunn's contrary preliminary hearing testimony"].)

Jackson nor his brother have been ticketed for driving the car with illegally tinted windows.

This evidence of multiple previous stops of Jackson and his brother for driving a car with tinted windows, which should be accepted as true at the prima facie stage, combined with the statistical evidence gives us pause. In other words, although perhaps not the strongest case of the possibility that Watson's and/or his fellow officers' actions were the product of implicit bias, we think the evidence sufficient to at least warrant an evidentiary hearing under the Racial Justice Act.

Our conclusion is buttressed by other evidence offered by Jackson. For example, the police officers were engaged in saturation policing in what they believed to be a high crime area. They observed two Black men (Jackson and his brother) enter the smoke shop. The police noticed Jackson's brother's red pants and speculated that they might be gang members, specifically they might be members of the Skyline Piru, a blood set gang. This speculation is consistent with the police's previous interactions with Jackson's brother where they repeatedly questioned his gang involvement. Further, this speculation appears to be linked to the fact that Jackson's brother is Black.

Further, after pulling over Jackson and his brother in the instant matter, we note that Watson did not ask Jackson about the tinted windows but instead focused on whether Jackson had any weapons or drugs in the car. And Watson testified that he became more concerned when he discovered that Jackson and his brother lived in "a violent apartment complex" where Watson had "arrested or been involved in the arrest of at least six people in or around that complex" who "were in possession of firearms."

But Watson admitted during cross-examination that he did not "see anything specific about a gun being in [the car]," and he lacked any

knowledge prior to pulling Jackson over that he had possession of a gun. Moreover, even though Watson acknowledged that the bat in the car led him to believe that there might be other weapons in the car, he stated that Jackson offered to move the bat for Watson. And despite the officer's claim that the car needed to be searched for the safety of the officers, Watson allowed Jackson to go into the glove compartment to obtain the car's registration.

Finally, we note that Watson seemed suspicious of Jackson because Jackson was nervous and shaking. Indeed, after the second time Watson asked Jackson if there were any guns in the car and Jackson responded in the negative, Watson observed, "All right, 'cause, 'cause your hands are really shaking. You seem nervous right now." Jackson tried to explain his response to being pulled over, " [C]ause y'all just make me shaky 'cause I know I'm being pulled up for no reason all the time." On cross-examination at the preliminary hearing, after Watson testified that sometimes people are "happy" to be pulled over by him, Watson and defense counsel engaged in the following exchange:

> "Q. In your experience, is it unusual for people to appear nervous?
>
> "A. For their hands to be visibly shaking, yes, that is unusual.
>
> "Q. How—would you say that it is unusual as to the general population? Or is it unusual when it's a young black men?
>
> "[Prosecutor]: Objection, your Honor. Argumentative.
>
> "THE COURT: Overruled.
>
> "The witness: It could be anybody."

21

Therefore, despite admitting that he has conducted hundreds of traffic stops and engaged in saturation policing in high crime areas, Watson seemed unaware that Black men might have reason to be nervous when interacting with police officers, especially after being pulled over and confronted by four officers ostensibly for driving a car with illegally tinted windows. Considering Watson's experience, his stated lack of awareness of this issue further raises the potential that implicit bias played a role in his decision to stop and search the car Jackson was driving.

Against this backdrop, we are persuaded that Jackson did enough to show there is a substantial likelihood of a violation of the Racial Justice Act as set forth in section 745, subdivision (h)(2). Thus, we believe the prudent course is for the trial court to grant an evidentiary hearing and consider anew Jackson's motion under the Racial Justice Act. We express no opinion whether the court should find a violation of the Racial Justice Act after holding such an evidentiary hearing.[9]

## DISPOSITION

Let a writ of mandate issue directing the superior court to vacate its order denying Jackson's motion for relief under the Racial Justice Act and to hold an evidentiary hearing under section 745, subdivision (c).

---

[9]     Additionally, the People insist that, in the petition, Jackson is offering himself as an expert witness, without any qualifications whatsoever, on issues of racial bias in policing. We do not consider Jackson's arguments in his petition as a request to treat him as an expert witness, nor do we consider him to be an expert witness. However, Jackson is certainly qualified to explain his dealings with the SDPD.

HUFFMAN, Acting P. J.

WE CONCUR:


IRION, J.


DO, J.